IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:16CR133 |
| | ) | |
| v. | ) | |
| | ) | |
| MERRILL ROBERTSON, JR., | ) | |
| | ) | |
| Defendant. | ) | The Honorable John A. Gibney, Jr. |

GOVERNMENT'S POSITION WITH RESPECT TO SENTENCING

The United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Katherine Lee Martin and Stephen E. Anthony, Assistant United States Attorneys, respectfully states that it has no objection to the Pre-Sentence Report ("PSR") and that the probation officer correctly calculated an advisory Guidelines range of 235 to 293 months under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). For the reasons stated below, it is the position of the United States that the purposes of Title 18, United States Code, Section 3553(a) are met by imposing a sentence of 293 months' imprisonment. To further support its recommendation, the government intends to call Special Agent David Hulser to present evidence at the sentencing hearing.

**I.      Procedural Background**

On June 6, 2017, a grand jury returned a 15-count superseding indictment charging Merill Robertson, Jr. with various crimes relating to his operation of an investment company, and his involvement in numerous fraudulent loans and lines of credit. The superseding indictment charged Robertson with conspiracy to commit mail and wire fraud, in violation of 18

U.S.C. § 1349; five substantive counts of mail fraud, in violation of 18 U.S.C. § 1341; two substantive counts of wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; four substantive counts of bank fraud, in violation of 18 U.S.C. § 1344; and two counts of money laundering, in violation of 18 U.S.C. § 1957.

The trial of this case began on August 14, 2017, and lasted nine days. After listening attentively to witness testimony, and examining over 200 exhibits, the jury found the defendant guilty of all counts in the superseding indictment. The Court scheduled the defendant's sentencing hearing for Wednesday, December 6, 2017 at 9:00 a.m.

## II.     Standards Governing Sentencing

In three separate opinions, the Supreme Court established a sentencing regime. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, but emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264. The Supreme Court reaffirmed this principle in United States v. Kimbrough, 128 S. Ct. 558 (2007) emphasizing that the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence. Id. at 564. Finally, in Gall v. United States, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the sentencing guideline range, permit the government and the defendant an opportunity to argue for whatever sentence they deem appropriate, consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. The Gall Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court must consider the extent of the deviation and ensure that

the justification is sufficiently compelling to support the degree of the variance. Id (noting that a major departure should be supported by a more significant justification than a minor one).

Applying these standards, the Fourth Circuit has concluded that a sentencing court must: (1) properly calculate the Guidelines range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence. United States v. Simmons, No. 07-4888, 2008 WL 681764, at *1 (4th Cir. March 11, 2008) (citing United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007)).

## III.   The Advisory Guidelines Range

The government has no objections to the Pre-Sentence Report. The government maintains that the appropriate advisory Guidelines range is 235 to 293 months. Defendant objects to the following enhancements to his offense level: (1) the eighteen-level increase for causing a loss of more than $3.5 million; (2) the two-level increase because the offense involved a vulnerable victim; (3) the four-level increase based on his role in the offense; and (4) the two-level increase for obstruction of justice. The government disagrees with the defendant and maintains that all enhancements have both a factual and legal basis.

### A.  The Pre-Sentence Report

The probation office calculated Defendant's advisory Guidelines range as 235 to 293 months. Defendant's base offense level is 7 pursuant to U.S.S.G. § 2B1.1. The probation office concluded that the following enhancements applied:

- An 18-level enhancement for a causing a loss of more than $3,500,000 (U.S.S.G. § 2B1.1(b)(1)(J));

- A 4-level enhancement because the offense resulted in substantial financial

3

hardship to five or more victims (U.S.S.G. § 2B1.1(b)(2)(B));

- A 2-level enhancement because the defendant knew or should have known that the offense involved a vulnerable victim (U.S.S.G. § 3A1.1(b)(1));

- A 4-level enhancement for being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive (U.S.S.G. § 3B1.1(a));

- A 1-level enhancement because the defendant was convicted of money laundering under 18 U.S.C. § 1957; and

- A 2-level enhancement for obstruction of justice (U.S.S.G. § 3C1.1).

The application of these enhancements results in an adjusted offense level of 38. Because the defendant has never admitted any involvement in these offenses, the probation officer correctly did not reduce his adjusted offense level for acceptance of responsibility. As a result, defendant's total offense level is 38. Defendant is in criminal history category I. Accordingly, defendant's advisory Guidelines range is 235 to 293 months' imprisonment.

### B. Defendant's Objections Are Without Merit

#### 1. The Pre-Sentence Report Appropriately Applied An 18-Level Enhancement Because The Defendant Caused A Loss That Exceeded $3,500,000

Merrill Robertson should receive an 18-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J) for causing a loss of more than $3.5 million but less than $9.5 million. Section 2B1.1 provides that defendants convicted of certain enumerated offenses, including crimes of fraud and deceit, are subject to an enhancement based on the amount of the loss resulting from the offense conduct. See generally § 2B.1.(b)(1). The Application Notes to that section clarify that "loss" is defined as the greater of "actual loss" or "intended loss." U.S.S.G. § 2B1.1, comment. n. 3(A). Here, actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." Id. The Application Note further clarifies that reasonably foreseeable

4

pecuniary harm is harm that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1, comment. n. 3(A)(iv). Loss may be calculated based on the gain realized by the wrongdoer "only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, comment. n. 3(B). Loss should be reduced, or offset, by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected." U.S.S.G. § 2B1.1, comment. n. 3(E)(i). Finally, when calculating the loss, the "court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, comment. n. 3(C).

Here, the loss amount for the defendant's investment fraud scheme is consistent with the directives set forth in the Application Notes to Section 2B1.1. The loss amount for the purposes of calculating the defendant's Guidelines range is the amount of investor funds the defendant and his partner collected minus any money paid back to investors. See GEX 14.

Defendant contends that because Government's Exhibit 16 (which broadly summarized the way Robertson and Vaughn spent investor funds) only "specifically prove[s]" that $3.3 million in investor funds went directly to the defendant and Carl Vaughn, then the "actual" loss is only $3.3 million, and only the "actual" loss should be considered by the Court.[1] Essentially, he asks the Court to ignore the rest of the summary chart he cites, which includes $625,344 in charitable

---

[1] IRS-CI Special Agent John Norton testified at trial about the $3.3 million in investor funds that he could specifically trace to Robertson and Vaughn through account transfer forms, withdrawal slips and the like. But Special Agent Norton also explained that he did not attribute any of the expenditures in the other categories on the chart individually to Robertson and Vaughn even though it was clear, for example, through the testimony of other witnesses that Mr. Robertson paid for family vacations to Hawaii and Disney World with investor money and that those expenditures were included in the broad category of entertainment/shopping/travel expenses.

contributions and $291,642 in educational and medical expenses,[2] and to offset his loss amount by money he supposedly spent on opening and operating several restaurants.[3]   Such an approach clearly misapprehends the law and facts of this case.

The Guidelines do not require a loss to be offset by any legitimate expenditures, but rather by "value" that has been conferred on victims in the form of money or property returned or services rendered.  Id.  Robertson's expenditures, legitimate or not, conferred nothing of value and no benefit on his victims.  He rendered no "services" to them and failed to deliver any return on their "investment."   See e.g. United States v. Hsu, 669 F.ed 112, 122 (2d Cir. 2012) ("stating Guidelines "provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of the principal invested."); United States v. Byors, 586 F.3d 222, 226 (2d Cir. 2009).

Moreover, the testimony of witnesses at trial made clear that this was not a matter of investors simply not receiving the benefit of their bargain.  Witnesses testified that they never would have given the defendant a dime if they had known the truth.  Defendant's fraud began when he first solicited each investor – to induce investments Robertson lied about, among other things, the success of his investments; that investor money was secured by tangible assets; that he would pay annual interest payments; and that investors' existing retirement accounts would be

---

[2] Even giving the defendant the most generous benefit of the doubt imaginable, there is no way to characterize hundreds of thousands of dollars in payments to Robertson's family church and to UVa for his stepsons' college tuitions as business expenses.

[3] The defendant's argument on loss also seemingly ignores the more than $290,000 in loss he caused as part of his bank fraud offenses.  Assuming the Court only counted $3.3 million in investor losses toward the defendant's loss amount, Robertson would still receive an 18-level enhancement for a loss of more than $3.5 million when the $290,000 in intended loss to financial institutions is added to that amount.

rolled over to tax-deferred retirement accounts managed by Cavalier. Accordingly, it is irrelevant whether the defendant ultimately used funds for so-called "legitimate" business expenses instead of personal purposes. This fraud occurred at inducement, not at some later point when the defendant began to spend investor money on unapproved expenditures. When he lied to get their investment and, thereafter, did not return their money, Defendant's fraud caused those victims' losses that must be counted for Guidelines purposes.

In any event, the Pre-Sentence Report contains a conservative estimate of loss. For example, it does not include the $600,000 Eugene Monroe wired to Cindy Estes at Robertson and Vaughn's direction. And it does not include the intended losses from all the additional fraudulent loans that Robertson tried but failed to secure. If those losses had been included, the defendant's loss amount would have exceeded $9.5 million, and he would receive an additional 2-level enhancement in his offense conduct.

### 2. The Pre-Sentence Report Appropriately Applied A 2-Level Enhancement Because The Defendant Knew Or Should Have Known That The Offense Involved a Vulnerable Victim

The Guidelines applies a 2-level enhancement if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b). A vulnerable victim is a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise susceptible to the criminal conduct." U.S.S.G. § 3A.1, comment. n. 2. In this case, the Pre-Sentence Report applies a 2-level enhancement because Defendant defrauded victim J.J., a person who defendant knew had dementia, and victim D.W., a senior retiree who testified during trial.

7

With respect to victim J.J., co-conspirator Carl Vaughn testified at trial that both he and Defendant knew that J.J. was elderly and having problems with his memory, and that they met with J.J. on at least four occasions. (Trial Tr. 476). Knowing about J.J.'s mental frailty, Vaughn and Defendant fabricated a proof of funds letter and other documents to induce J.J. to invest in Cavalier Union Investments. (Trial Tr. 477-87). Defendant contends that because J.J. had a financial advisor and other family members assisting him in his business endeavors that J.J. was not a vulnerable victim. However, Defendant's objection should fail for at least two reasons.

First, nothing in the Guidelines indicates that the presence of mitigating factors makes this enhancement any less applicable. In other words, Defendant's objection amounts to a results-based approach: because, as Defendant sees it, J.J. had other measures in place to prevent him from being taken advantage of, then he is not a vulnerable victim. That is not the focus of the Guidelines enhancement. Instead, the focus is whether Defendant knew or should have known that J.J. was vulnerable due to a mental condition when he committed the fraud. This fact is undeniably true.

Second, even if the Court were to consider other factors that may make the victim less susceptible to fraud despite his vulnerability, as Defendant invites the Court to do, nothing in this case indicates that J.J.'s advisors or family members had the authority to prevent J.J. from making decisions based on Defendant's fraudulent representations independent of their advice. Neither J.J.'s financial advisor nor his family members exercised power of attorney or ultimate decision-making authority in order to prevent J.J. from falling victim to Defendant's lies. Accordingly, J.J. remained a vulnerable victim, regardless of their presence or assistance.

8

With respect to victim D.W., the Court observed this victim's testimony that he almost exclusively relied upon Defendant to instruct him on his investments and, ultimately, his decision to take out fraudulent bank loans.  He testified to not understanding these processes and, as a result, he acted as Defendant directed.   <u>See</u> (Trial Tr. 1076-77).  Further, it was D.W.'s age, retirement, and loss of funds through investing with Defendant which led to Defendant recruiting him in 2016 to begin taking out fraudulent bank loans.  <u>See</u> (Trial Tr. 1080-86).  D.W. was in no way sophisticated or adept at financial investments to handle his own affairs apart from Defendant's advice.

### 3.   The Pre-Sentence Report Appropriately Applied A 4-Level Enhancement For Being An Organizer Of Five People Or Criminal Activity That Was Otherwise Extensive

The Pre-Sentence Report appropriately applied a 4-level enhancement for being an organizer or leader of five participants or criminal activity that was otherwise extensive.  U.S.S.G. § 3B1.1(a).  The application notes define a "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  <u>Id.</u> app. n. 1. The application notes further state that the aggravating role adjustment does not depend on the defendant's title, but rather factors such as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  <u>Id.</u> app. n. 4. As the Fourth Circuit has emphasized, the application of this enhancement "involves a factual determination."  <u>Steffen</u>, 741 F.3d at 415.  Moreover, the background of the section explains that "[t]his section provides a range of adjustments to increase

the offense level based upon the size of the criminal organization (*i.e.*, the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense." Id. background.  Applying these factors here, the United States submits that it has demonstrated by a preponderance of the evidence that defendant was an organizer or leader of over five people involved in his crimes.

The evidence presented at trial demonstrated that the defendant directed at least, five participants in his bank fraud scheme.  That is, Defendant's scheme included the four separate borrowers that testified at trial, as well as Defendant's aunt that served as the supposed seller of a car to Willie Crudup and who laundered money through her bank account at the defendant's direction.  Obviously, the number of participants grows when the Court considers the three convicted conspirators that testified at trial, Frederick Davis, Jason Eaton, and Marlon Hardy, as well as the other participants referred to during their testimony.

Defendant rightly concedes that he recruited these borrowers.  The clear testimony from Mr. Jefferson, Mr. Studevant, Mr. Wilmer, and Mr. Crudup revealed that but for Defendant contacting them to involve them in taking out the fraudulent loans, they would not have become involved.

Defendant exercised significant control and authority over the actions of all of the borrowers in this case.  He absolutely managed and supervised "one or more other participants" involved in this scheme.  U.S.S.G. § 3B1.1, comment. n. 2.  Robertson did not act as a mere "go-between" or "broker" in this case.  To the contrary, Defendant directed the borrowers as to the information needed to apply for the loans, about how to procure the moneys from the bank once the loans were approved, and, in some cases, where to deposit the proceeds from the fraudulent

loans. Indeed, in the case of Mr. Jefferson, Defendant directed Mr. Jefferson to deposit the loan proceeds directly into Defendant's bank account and gave Mr. Jefferson access to Defendant's bank account for that purpose. With respect to Mr. Crudup and Mr. Wilmer, Defendant actually traveled to the banks with these borrowers in order to direct them. Both Mr. Crudup and Mr. Wilmer poignantly testified about the direction they received from the defendant when they went to sign the loan documents. Mr. Crudup testified that he left the NFCU branch when he saw the car loan promissory note, and that Robertson convinced him to come back inside and complete the transaction. Mr. and Mrs. Wilmer described the confusion they experience standing in a teller line with Robertson as he cashed their loan proceeds check.

When considering the nature and scope of the criminal activity, the facts also show that Defendant's bank fraud scheme covered several banks and multiple other conspirators, apart from the borrowers. For example, Defendant's initial co-conspirators were Marlon Hardy and another person with connections to Georgia and each of the banks through which Defendant directed Mr. Studevant and Mr. Jefferson to take loans. Subsequently, Defendant and Marlon Hardy worked with Jason Eaton and Frederick Davis to exclusively focus on getting loans with Navy Federal Credit Union. Moreover, Defendant attempted to, and in at least one case did, involve his family in the conspiracy, attempting to get loans in the name of his wife and his aunt, and using his aunt's bank account as a conduit for a loan procured through Mr. Crudup. In sum, this conspiracy covered multiple banks, multiple co-conspirators, multiple borrowers, and even involved family. And, Defendant played a vital role throughout.

Finally, Robertson certainly claimed his right to the larger share of the fruits of the crime. Indeed, he received the vast majority of the loan proceeds obtained by borrowers Kurt Studevant

and Butch Jefferson.   And while Defendant may not have received as large a share of the proceeds from loans obtained by Willie Crudup and Danny Wilmer, he still received a significant amount of money for each transaction.   For example, Danny and Myrna Wilmer testified that Robertson pocketed $10,000 (or approximately 25 percent) from a $41,000 car loan he facilitated.   The other three conspirators split $21,000 of that loan amongst themselves.

Alternatively, if the Court concludes that Defendant was not an organizer or leader of a conspiracy involving five or more people, then, at the very least, the Court should apply the three-level enhancement identified in § 3B1.1(b).   Section 3B1.1(b) provides for a three-level increase "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."   U.S.S.G. § 3B1.1(b).   For the reasons discussed above, Robertson was the organizer, leader, manager and supervisor of crimes that involved numerous complicit individuals.   Accordingly, if the Court concludes that the three-point enhancement is not justified, then the Court should enhance defendant's advisory Guideline range by at least two levels due to his role in the schemes.

### 4.   The Pre-Sentence Report Appropriately Applied a 2-Level Enhancement for Obstruction of Justice

The Pre-Sentence Report correctly applied a two-level obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1 based on defendant's obstructive behavior during the federal investigation as well as defendant's false testimony under oath during the trial.   Section 3C1.1 provides for a two-level enhancement where:

> (1)      The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

12

U.S.S.G. § 3C1.1. The application notes provide examples of covered conduct that include "committing, suborning, or attempting to suborn perjury." (app. n. 4(B)).

The defendant willfully obstructed the administration of justice by taking the stand and committing perjury as to material matters in the instant trial. In United States v. Dunnigan, 507 U.S. 87, 113 S. Ct. 1111 (1993), the Supreme Court concluded that this enhancement may apply where, as here, a defendant willfully gives false testimony concerning a material matter related to the case. Id. at 94, 1116 ("[A] defendant's right to testify does not include a right to commit perjury."). To support its application, the Supreme Court stated that it was preferable for a district court to address "each element of the alleged perjury in a separate and clear finding." Id. at 95, 1117.

Applying Dunnigan, the Fourth Circuit has concluded that there are three elements necessary to impose a two-level enhancement for obstruction of justice based on the defendant's perjurious testimony: "the sentencing court must find that the defendant: '(1) gave false testimony; (2) concerning a material matter; (3) with willful intent to deceive.'" United States v. Perez, 661 F.3d 189, 192-94 (4th Cir. 2011) (quoting United States v. Jones, 308 F.3d 425, 428 n.2 (4th Cir. 2002); United States v. Sun, 278 F.3d 302, 314 (4th Cir. 2002) (citing United States v. Smith, 62 F.3d 641, 646 (4th Cir. 1995)). Moreover, the Fourth Circuit has stated that the district court must provide a finding that "clearly establishes" each of the three elements. Id. (noting that with respect to willfulness, it would be enough for the court to say, "[t]he defendant knew that his testimony was false when he gave it.").

Applying these parameters, the Fourth Circuit regularly upholds the application of the obstruction of justice enhancement where defendants take the stand in their defense and commit

perjury as to material matters.  For example,  in United States v. Perez, No. 12-6303, 2012 WL 3642849, *2 (4th Cir. 2012), the Fourth Circuit affirmed the application of the enhancement where:

> [t]he court found that Perez falsely testified when he denied under oath that he was involved in cocaine trafficking, which directly contradicted Government witness testimony which the jury found more credible.  Second, the court found that Perez's false testimony concerned a material matter, namely his guilt or innocence.  Finally, the court found that Perez acted willfully with the intent to deceive ... by testifying in direct contradiction to witnesses whose testimony the jury found more credible....

Id.; see also United States v. Ecklin, No. 12-4323, 2013 WL 2679080, *6 (4th Cir. June 14, 2013) (affirming application of enhancement after defendant's perjurious trial testimony); United States v. Cartrette, No. 12-4186, 2012 WL 6734788 (4th Cir. 2012) (affirming application of enhancement where defendant perjured himself at trial); United States v. Quinn, 359 F.3d 666, 681 (4th Cir. 2004) (affirming application of enhancement where defendant's false testimony was material because it concerned the essential facts of the crime charged.).  Based on this standard, the United States submits that the trial record establishes by a preponderance of the evidence each element of the obstruction enhancement.  Like the defendant in Perez, the defendant took the stand at trial and: (1) gave false testimony;  (2) concerning material matters, specifically, his guilt or innocence of the crimes charged; (3) with a willful intent to deceive the members of the jury regarding his commission of these crimes.

Without accounting for the multiple instances in which delivered false testimony in this case and was impeached during cross-examination, the United States would focus on Defendant's contention that he was instructed that his accepting money from investors' retirement accounts did not amount to a taxable event.  As the Court recently stated, Defendant's statements amounted to

14

unadulterated nonsense, and nowhere near approached the truth. The Court remains in the best position to consider Defendant's credibility in this case and whether he provided false testimony. As a result, the United States maintains that the Pre-Sentence Report correctly applied this enhancement.

## IV.    Statutory Sentencing Factors

Under Title 18, United States Code, Section 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, this Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

In light of these factors, a sentence of over 24 years' imprisonment for Robertson's multiple convictions is reasonable and appropriate. As discussed below, the application of the Section 3553(a) factors – in particular the nature and circumstances of the offenses, the history and characteristics of the defendant, and the need to afford adequate deterrence – support a significant sentence of imprisonment in this case.

15

### A.    Nature and Circumstances of the Offense

The Court, having presided over a 9-day jury trial, is well acquainted with the facts of this case. Beyond the heart-wrenching testimony of witnesses at trial, the Court has now received numerous victim impact statements that provide greater detail of the scope and lasting impact of the defendant's crimes. The nature and circumstances of Merrill Robertson's offenses merit the harshest possible penalty for several reasons.

First, the defendant's conduct took place over an extended period. Robertson first transferred money from a Merrill Lynch account to Carl Vaughn in December 2008. And, he did not quit stealing money from people until his crimes were discovered and he was arrested in August 2016. This was not a momentary lapse of judgment nor was it a limited fraud scheme. Robertson engaged in two separate conspiracies aimed at stealing money that together lasted nearly a decade.

Second, the defendant used and exploited those closest to him to commit his crimes. The testimony presented at trial showed that Merrill Robertson thought nothing of involving his family and closest friends in his criminal conduct. He had his stepson fabricate the account statements he sent investors to lull them into believing that their money was secure and growing in an investment account. He attempted to obtain fraudulent loans in the name of his wife and aunt. He had his aunt launder the proceeds from Willie Crudup's fraudulent car loan. And, he got his best friend to engage in bank fraud just so he could have some spending money.[4]

---

[4] For example, Government Exhibit 136a shows that Robertson spent some of the approximately $62,000 in loan proceeds he got from Butch Jefferson's loans on Dick's Sporting Goods ($1,120.05), Nordstroms ($116.88), and El Patron Restaurant ($225.80). See GEX 136a; (Trial Tr.

Beyond recruiting his family and friends to act as his accomplices, the defendant also thought nothing of betraying the trust of family, friends, and mentors to pocket their hard-earned money. The testimony presented at trial showed that Merrill Robertson collected money from, among others, his brother-in-law, his childhood Sunday School teacher, his high school basketball coach, and the man who recruited him to play football at the University of Virginia. The Court also heard numerous witnesses testify that the defendant preyed on people's religious faith, often quoting scriptures or praying with investors to lead them to believe that their money was in honest hands. One victim impact statement even described the defendant soliciting people from the pulpit of his family church. Fraud cases are always ultimately about lying to and stealing from others. But, the defendant's willingness to harm those that have loved, supported and mentored him is especially abhorrent.

Third, the callousness of the defendant's lies to his victims was extraordinary. For example, the Court heard testimony that the defendant told Kathy Sullivan to retire early from her job as a nurse even though Robertson knew at the time that he had spent all her retirement savings. Having taken the defendant's advice, Ms. Sullivan was at her retirement party when she learned that all her money was gone. A victim impact statement from J.C. described how the defendant promised to return a portion of her investment so that she could pay for her daughter's wedding. Robertson even wrote a check for the reception. But, the check bounced and J.C. was left to borrow the money at the last moment for what should have been a happy occasion. Text messages introduced during cross-examination of the defendant showed how Robertson lied about being in Switzerland when one victim asked for the return of his money so that he could pay medical bills for his dying daughter. The Court heard testimony that Robertson promised to invest the loan proceeds from a loan he facilitated for family friend Kurt Studevant, but instead

spent the money to pay off his $13,000 American Express bill. See GEX 115. Mr. Studevant, a special education teacher on a fixed-income, is still paying $250 a month toward this loan even though he never received a dime of the money. The Court also heard testimony that the defendant promised he would make payments on a fraudulent car loan he facilitated for Danny Wilmer, but instead that Robertson used a portion of the $10,000 in loan proceeds he pocketed to take his family on vacation to Miami. Sadly, these are but a few examples of the depths to which Merrill Robertson was willing to sink to steal money and cover his tracks.

Fourth, the summary charts introduced at trial detail the frivolous and flagrant way the defendant and his partner spent people's life-savings. For example, it took Merrill Robertson and Carl Vaughn about two weeks to spend Del Mace's $199,800.97 in retirement savings. See GEX 50. Among other things, the defendant spent Mr. Mace's savings on his own mortgage payment ($2,472.61), a trip to the spa ($205), and children's circus lessons ($510). Id. It took Merrill Robertson and Carl Vaughn a little over a month and a half to spend Eugene Monroe's $300,000 investment supposedly in two Sweet Frog Frozen Yogurt franchises. See GEX 95. Among other things, the defendant spent Mr. Monroe's hard-earned money on a donation to his aunt's church ($1,500), catering for Cavalier's private suite for UVa football games ($1,180.48), and a Marriott vacation timeshare ($257). Id. It took Merrill Robertson and Carl Vaughn about two months to spend Tommie and Melinda Sides' $457,813.03 in retirement savings. See GEX 58. Among other things, the defendant spent Mr. and Mrs. Sides' money on shopping at Nordstroms ($976.81), jewelry ($1,160), and private school tuition ($2,153). Id. Of course, Robertson argued at trial (and even now at sentencing) that the government's summary of how he and his partner spent the $10.4 million they collected from investors was misleading. Specifically, the defendant claimed that much of the money broken down into broad categories

18

on that particular summary chart could have been spent on the restaurants the defendant opened and operated for a brief period. See GEX 16. Notwithstanding the fact that the defendant did not operate a single business during the vast majority of the time that he collected money, the more detailed charts that summarize exactly how the defendant and his partner spent each investment by the representative investors that testified at trial (including those described above) make clear how ridiculous the defendant's claim is. Cavalier Union Investment's operating account was a slush fund the defendant used to live large.

Finally, the damage the defendant wrought for his own selfish gain is inestimable. The Court heard testimony that Del Mace sold his home because he could no longer pay the mortgage. Willie and Diane Crudup declared bankruptcy. Many more victims have described the impact of the defendant's crime in victim impact statements. For example, one victim, a 72 year-old farmer, explained that he could no longer retire, but must keeping working to make up for the money lost investing in Cavalier. Another elderly victim described her inability to afford in-home care or assisted living because of this crime. One victim explained that the loss of her life-savings placed a terrible strain on her long-term marriage, and that she has trouble trusting people in the wake of this betrayal. The widow of another victim wrote that the sense of shame, and financial strain resulting from this crime contributed to her late husband's decision to commit suicide. The enormous and lasting impact of the defendant's crime reflects that this was not a run-of-the-mill fraud case. Merrill Robertson's punishment should reflect as much.

## B.    History and Characteristics of the Defendant

Defendant's history and characteristics also support a significant sentence. Unlike a lot of defendants who come before this Court, Merrill Robertson enjoyed many opportunities and

advantages in life.  According to the PSR, the defendant was raised in a middle-income, two-parent household.  PSR ¶ 100-02.  His childhood was free of any mental or physical abuse.  Id.

The defendant was also well educated.  The Court heard testimony at trial that the defendant attended L.C. Bird High School in Chesterfield where he was mentored by Basketball Coach Tommie Sides.  PSR ¶ 127; (Trial Tr. 655-56).  The defendant attended Fork Union Military Academy for a post-graduate year where again he was mentor by Athletic Director Henry "Mickey" Sullivan.  PSR ¶ 127; (Trial Tr. 655-56).  Then he spent four years at the University of Virginia where again he was mentor by Recruiting Coordinator and Offensive Line Coach Danny Wilmer.  PSR ¶ 125; (Trial Tr. 1065-67).  His formal educational training and the informal guidance and support of numerous mentors along the way certainly taught the defendant the difference between right and wrong.

Merrill Robertson had enviable employment opportunities.  He spent several years pursuing professional football with the Philadelphia Eagles and the Minnesota Vikings. Thereafter, he was hired as a financial advisor with nationally renowned wealth management company Merrill Lynch.  PSR ¶ 130-31. There the defendant received valuable training, and a stable, well-respected, well-resourced platform on which to build his career.  Instead, the defendant used his position at Merrill Lynch to launch his fraud scheme.  The evidence presented at trial, and the facts set forth in the Pre-Sentence Report make clear that the defendant did not commit a crime of necessity.  It was a crime of pure greed.

Most importantly, the defendant fails to accept any personal responsibility for his actions and blames everyone but himself for his plight.  At trial, Robertson brazenly suggested that he was a victim of his conspirators.  First, the defendant claimed that he was defrauded by his business partner Carl Vaughn, even though he was the one who received extensive training on

the rules and regulations that govern financial advisors; he was the one who solicited the vast majority of Cavalier's investors; and he was the one that received a greater share of the fraud proceeds. Second, the defendant stated that he was duped by Marlon Hardy, Jason Eaton, and Fred Davis, even though he was involved in fabricating pay stubs and other fake documents; he received nearly all of the fraud proceeds related to two of the four borrowers; and he was warned by one of the borrowers that what he was doing was illegal. After trial, the defendant has blamed the Court, the government and the witnesses against him for his convictions. The government will introduce jailhouse recordings at the defendant's sentencing hearing in which, among other things, Merrill Robertson states that the witnesses who testified against him at trial lied; he states that he (not his victims) should be the one receiving an apology; and he laughs over a victim impact statement written by a victim who invested $3,000. Even for a defendant that has maintained his innocence, Merrill Robertson's total lack of remorse is astonishing.

In short, the defendant's history and characteristics do not weigh in his favor.

### C.      Adequate Deterrence to Criminal Conduct

The Court must also weigh the need for the sentence imposed to afford adequate specific and general deterrence. 18 U.S.C. § 3553(a)(2). In this respect, the government submits that a sentence of more than 24 years is also justified.

Robertson is a prime example of an individual who requires specific deterrence. His schemes to defraud were calculated and repetitive. With each investor and borrower, Merrill Robertson had an opportunity to tell the truth. Instead, he used each new victim (over 60 in all) to further enrich himself and stave off the eventual discovery of his crimes. The defendant had multiple opportunities to stop his criminal conduct, but at every turn he persisted. After the defendant ran out of new investors to approach, he embarked on a bank fraud scheme. After the

21

defendant was warned by Kurt Studevant that obtaining a car loan without purchasing a car was illegal, he facilitated three more fraudulent car loans. After the defendant was deposed by the Securities and Exchange Commission; he forwarded Danny Wilmer's last $100,000 in retirement savings to Charles Marshall, and he accepted one last distribution from Henry Sullivan's Individual Retirement Account. After federal law enforcement agents executed search warrants at the defendant's home and place of business, he walked Willie Crudup and Danny Wilmer into Navy Federal Credit Union branches to obtain more than $100,000 in fraudulent loans. And after the government presented overwhelming evidence of the defendant's guilt at trial, he took the witness stand and lied under oath.

Moreover, the defendant has continued his efforts to engage in investment schemes and manipulate those closest to him from behind bars. The government will introduce recordings at the defendant's sentencing hearing showing that he continues to talk with people, including Charles Marshall, about various investments, and that the defendant recently addressed a group of people over the phone telling them among other things that "it takes God's people, us, to tell the truth" and that there was "a lot of false truths [and] a lot of wickedness [used] to put God's anointed away". The defendant's pattern of conduct is clear – Merrill Robertson has given every indication that he will continue to lie and exploit others for his own ends. Only a substantial period of incarceration will deter him.

A sentence within the advisory Guidelines range is also appropriate to establish the goal of general deterrence. General deterrence is perhaps even more important in complex fraud cases such as this one, which are often difficult to detect, investigate, and prosecute. See e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are 'more rational, cool, and calculated than sudden crimes of passion or

opportunity' these crimes are 'prime candidates for general deterrence.'"). A substantial penalty will provide the appropriate disincentives to those contemplating similar crimes. See e.g., United States v. Morgan, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized."); United States v. Bergman, 416 F. Supp. 496, 499 (S.D.N.Y. 1976) (stating that absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved.). The Court must send the strongest possible message to those who would engage in similar conduct that they will be caught and will be punished to the fullest extent of the law.

### D.    The Need To Protect The Public

When fashioning an appropriate sentence, the Court must also consider protecting the public from further crimes committed by the defendant. 18 U.S.C. § 3553(a)(2). As discussed above, Merrill Robertson continues (even behind bars) to pursue various investment schemes. Given the enormous harm he has already caused, a sentence of more than 24 years will ensure that he cannot leave one more family destitute in their retirement years.

### E.    The Need To Avoid Unwarranted Sentencing Disparities

A sentence in the advisory Guidelines range will not result in unwarranted sentencing disparities. Merrill Robertson is easily distinguishable from all four conspirators who pled guilty, cooperated with the government, and testified at trial. Unlike those defendants, Merrill Robertson refuses to accept any responsibility for his crimes, he obstructed justice in an effort to avoid punishment, and he has shown no remorse for his conduct.

The defendant is distinct from his business partner Carl Vaughn for additional reasons. Certainly, both men are to blame for the business they created and operated together. But Merrill Robertson is more culpable for the crimes committed through Cavalier Union Investments because he violated a duty of loyalty to his employer, Merrill Lynch; he received extensive training on the rules and regulations that govern financial advisors in order to obtain his Series 7 and 66 licenses; he convinced all but one of Cavalier's 63 investors to part with their savings,[5] and according to summary charts introduced at trial he received a greater share of the fraud proceeds. Most importantly though, Merrill Robertson separated himself from Mr. Vaughn when he went on to commit a separate bank fraud scheme, re-victimizing some of Cavalier's initial investors.

The defendant is also different from his bank fraud conspirators Marlon Hardy, Jason Eaton, and Fred Davis. None of those defendants had anything to do with stealing over $10 million from more than 60 individuals. Simply put, Merrill Robertson is in a category all his own.

**F.     The Seriousness of the Offense Conduct and The Need to Provide Just Punishment**

Finally, the advisory Guidelines range in this case certainly reflects "the seriousness of the offense[s]." 18 U.S.C. § 3553(a)(2)(A); United States v. Goff, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes"). But the real tragedy here is that even a sentence within the advisory Guidelines range

---

[5] At trial, Robertson admitted that he (not Carl Vaughn) solicited all of Cavalier's investors: "[P]eople trusted me. They trusted me. That I was in this business. They trusted me, not him. You know he only brought in one person, I think one person. The rest came in because they trusted me." See (Trial Tr. 1333). By Merrill Roberton's own admission, this crime would not have occurred (on this scale) had it not been for the his involvement.

will not change the outcome for Merrill Robertson's victims.   There are no assets to seize.   The money is gone.   Merrill Robertson and Carl Vaughn have zero ability to earn it back.   And many of these victims are at an age where they cannot possibly recover what they have lost.   While so many struggle through what should have been their golden years, a substantial sentence will at least provide just punishment for this offense, and may, in some measure, help some of these victims heal.

## V.      Conclusion

For the reasons discussed above, the United States respectfully requests that the Court sentence Merrill Robertson, Jr. to 293 months in prison.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:      _____/s/_____

Katherine Lee Martin
Stephen E. Anthony
Assistant United States Attorneys
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 819-7417

25

CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of November 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Patrick Hanes, Esquire
Jonathan Lucier, Esquire
Counsel for Defendant
Williams Mullen P.C.
200 South Tenth Street
P.O. Box 1320
Richmond, VA 23219
phanes@williamsmullen.com
jlucier@williamsmullen.com

By    /s/_____

Katherine Lee Martin
Assistant United States Attorney
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219-2447
Phone:  (804) 819-5400
Fax:  (804) 819-7417
katherine.martin@usdoj.gov